UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY JAY SANDERS,

                  Petitioner,

                                         CASE NO. 13-cv-12935

v.

                                         HONORABLE VICTORIA A. ROBERTS

MARY BERGHUIS,

                  Respondent.

_____/

**OPINION AND ORDER
DENYING THE REQUEST FOR APPOINTMENT OF COUNSEL (ECF NO. 13),
DENYING THE PETITION FOR WRIT OF HABEAS CORPUS (ECF NO. 1),
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, BUT
<u>GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL</u>**

       Petitioner Timothy Jay Sanders filed a *pro se* petition for writ of habeas corpus

on July 5, 2013.  The pleading challenges Petitioner's state convictions for three counts

of armed robbery, one count of assault with intent to rob while armed, and three firearm

offenses.   Petitioner alleges that a pretrial identification procedure was unduly

suggestive, that the trial court abused its discretion when ruling on his motion to

suppress the identification testimony, and that his trial attorney was ineffective.

Respondent Mary Berghuis urges the Court through counsel to deny the habeas petition

because Petitioner's claims lack merit or were procedurally defaulted in state court.  The

Court agrees that Petitioner's claims do not warrant habeas relief; the Court denies the

petition.

## I. Background

The charges against Petitioner arose from two robberies at supermarkets in Detroit, Michigan during April of 2008.  The two cases were consolidated for a bench trial in Wayne County Circuit Court.

### A.  The Trial

#### 1.  Prosecution Witnesses

In case number 08-7464, the Wayne County prosecutor charged Petitioner with armed robbery, assault with intent to rob while armed, assault with a dangerous weapon (felonious assault), felon in possession of a firearm, and possession of a firearm during the commission of a felony (felony firearm).  The robbery in that case occurred  at the Food Giant Store on Greenfield Road  where Nidhal Yono and Debra Leach were cashiers.  They testified at trial that Petitioner approached them with a gun about 5:00 p.m. on April 19, 2008, and demanded money.  Both women identified Petitioner at a line-up eleven days after the crime and again at trial.  The manager of the store, Ghazwan Denha, observed the robbery from a glass-enclosed office in the store.  He also identified Petitioner in the line-up and at trial.

In case number 08-6148, the prosecutor charged Petitioner with two counts of armed robbery, one count of felon in possession of a firearm, one count of carrying a concealed weapon, one count of felony firearm, and one count of felonious assault. That robbery occurred on April 22, 2008, at the Banner Supermarket on Schaefer Road in Detroit.

Zina Abro testified that she was working at the cash register when a man pointed a gun at her and told her to hand over the register.  Initially, she could not open the

register drawer.  So, the man went to the other cashier.  The man returned to her, however, and because her register was open by that time, she put the entire drawer in a bag and gave it to the man.  After the man went back to the other cashier, he left the store.  Ms. Abro identified Petitioner at a line-up in the Wayne County Jail on April 30, 2008, and at trial.

Diane Kinaia was the other cashier at the Banner Supermarket on April 22, 2008.  She testified that someone came from behind her, hit her behind the shoulder with a gun, and demanded money from her register.  The man went to the other register, but returned to her.  He left the store after she gave him the currency in her cash register drawer.   Ms. Kinaia identified Petitioner at trial and at the line-up held eight days after the robbery.

Charles Moore testified that he was a stock clerk at the Banner Supermarket and that he observed the robbery on April 22, 2008, while he was working at the front of the store by the cash registers.  He followed the robber out of the store and saw where he went.  When the police pulled up, he pointed out the direction in which the man had walked away.  About eight days after the robbery, he went to the Wayne County Jail where he identified Petitioner in a line-up.

Police Officer Garrett Taylor testified that, on April 22, 2008, he was on routine patrol when two juveniles informed him that the Banner Supermarket was being robbed.  Officer Taylor and his partner drove to the supermarket where the security guard pointed to a fleeing man and said that was the person who robbed the store.  Officer Taylor and his partner pursued the man in their vehicle.  The fleeing man turned around, saw them, and ran between some houses.  Taylor gave chase on foot.  As the man

3

hopped a fence, he dropped a cash register drawer.  Officer Taylor lost sight of the man, but he later heard over the air that the man was apprehended.  He subsequently retraced his steps and noticed the cash register drawer and some currency on the grass.  He also found a handgun along the path that he had chased Petitioner.  At trial, Officer Taylor identified Petitioner as the man he chased on April 22, 2008.

Police Officer Eugene Fitzhugh testified that Petitioner was caught at 14536 Snowden, that a cash register drawer containing $492.11 was found there, and that a weapon was recovered from the rear of 14553 Littlefield.  Police Officer Shetekia Brown testified that she and her partner observed Petitioner jogging slowly near Eaton and Schaefer Streets a few minutes after she received a description of the suspect from another police officer.  She got of the car to investigate and then detained Petitioner.  As she patted him down, Petitioner said that he did not have a gun and that he had dropped it.

### 2.  Defense Witnesses

Petitioner's aunt, Lesa Smith, testified for the defense that Petitioner was with her on April 19, 2008.  She claimed that the two of them went to her niece's house about 5:00 or 5:30 p.m. that day and that she and Petitioner "hung out" together at her girlfriend's house until 2:30 a.m. the next morning.

Petitioner testified that he was with his Aunt Lesa on April 19, 2008, and that they went to his sister's house, to his cousin's house, and then to the house of his aunt's friend.  He denied stopping by the Food Giant supermarket.  As for April 22, 2008, he claimed that his former girlfriend came over to his house about 4:00 p.m. and that they got into an argument.  He left the house about 5:00 p.m. and started walking "to blow off

4

some steam." He saw a lot of police activity and tried to return home, but he was arrested about two miles from his home. At trial, he denied telling the arresting police officer that he had dropped a gun and did not have the gun.

### 3. The Trial Court's Findings, Conclusions, and Sentence

On August 20, 2008, the trial court read its findings of fact and conclusions of law to the parties. In case number 08-7464, the trial court found Petitioner guilty of armed robbery, Mich. Comp. Laws § 750.529, assault with intent to rob while armed, Mich. Comp. Laws § 750.89, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and felony firearm, Mich. Comp. Laws § 750.227b. In case number 08-6148, the trial court found Petitioner guilty of two counts of armed robbery and one count of felony firearm. The court acquitted Petitioner of the remaining charges, including two counts of felonious assault, one count of felon in possession of a firearm, and one count of carrying a concealed weapon.

On September 8, 2008, the trial court sentenced Petitioner to concurrent terms of fifteen to twenty years in prison for the robbery and assault convictions and two to five years in prison for the felon-in-possession conviction. The trial court sentenced Petitioner to a consecutive term of two years in prison for the felony firearm convictions.

### B. The Direct Appeal and State Collateral Proceedings

In an appeal as of right, Petitioner argued that the pretrial line-up was impermissibly suggestive and that the trial court applied an incorrect legal standard when ruling on his motion to suppress the identification testimony. The Michigan Court of Appeals disagreed and affirmed Petitioner's convictions in an unpublished, *per curiam* opinion. *See People v. Sanders*, Nos. 288099 and 288100 (Mich. Ct. App. Apr.

5

15, 2010.)  Petitioner raised the same issues in the Michigan Supreme Court, which denied leave to appeal on September 9, 2010, because it was not persuaded to review the issues.  *See People v. Sanders*, 488 Mich. 857; 787 N.W.2d 113 (2010) (table).

Petitioner subsequently filed a motion for relief from judgment in which he argued that (1) the trial judge abused her discretion when she based her decision regarding the constitutionality of the line-up on the height and weight of the participants in the line-up, as opposed to the witnesses' description of the suspect, the video, and the amount of time the witnesses had to observe the suspect; (2) trial counsel was ineffective for failing to object when someone said that the witnesses had time to view the suspect during the robbery; (3) trial counsel was ineffective for failing to adequately investigate evidence that Petitioner's skin tone and hair differed from that of the other participants in the pretrial line-up; and (4) the pretrial identification was unduly suggestive.  The trial court denied Petitioner's motion after concluding that it was precluded from deciding three of Petitioner's claims because he raised them on direct appeal and that Petitioner had failed to show actual prejudice from the alleged irregularities that supported his remaining claim for relief.

Petitioner appealed the trial court's decision, but he merely reiterated his challenge to the pretrial identification procedure, an issue that he raised on direct appeal.  The Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. Sanders*, No. 310573 (Mich. Ct. App. Nov. 3, 2012).

Petitioner raised the same claim in a subsequent application for leave to appeal in the Michigan Supreme Court.  He also raised two new issues, claiming that he was

6

denied impeachment evidence (pictures of the line-up participants) and that the line-up attorney misled him in order to induce him to participate in the line-up.  On June 25, 2013, the Michigan Supreme Court denied leave to appeal for failure to establish entitlement to relief under Rule 6.508(D).  *See People v. Sanders,* 494 Mich. 868; 832 N.W.2d 231 (2013) (table).

## C.  The Habeas Petition and Responsive Pleading

On July 1, 2013, Petitioner signed and dated his habeas petition, and on July 5, 2013, the Clerk of the Court filed the petition.  Petitioner argues that the trial judge abused her discretion when ruling on the constitutionality of the line-up, that his trial counsel was ineffective, and that the pretrial identification was unduly suggestive. Respondent argues in her answer to the petition that Petitioner's claims are procedurally defaulted or meritless.

"[A] procedural default, that is, a critical failure to comply with state procedural law, is not a jurisdictional matter," *Trest v. Cain*, 522 U.S.87, 89 (1997), and the Court has determined that Petitioner's claims lack substantive merit.  Thus, a determination of whether Petitioner procedurally defaulted his claims "adds nothing but complexity to the case."  *Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010). The Court therefore excuses any procedural defaults and proceeds directly to the merits of Petitioner's claims, using the following standard of review.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*,

562 U.S. 86, 97 (2011).  Pursuant to § 2254, the court may not grant a state prisoner's

application for the writ of habeas corpus unless the state court's adjudication of the

prisoner's claims on the merits

> (1)     resulted in a decision that was contrary to, or involved an
>         unreasonable application of, clearly established Federal law,
>         as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable
>         determination of the facts in light of the evidence presented
>         in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court
> may grant the writ if the state court arrives at a conclusion opposite to that
> reached by [the Supreme] Court on a question of law or if the state court
> decides a case differently than [the Supreme] Court has on a set of
> materially indistinguishable facts.  Under the "unreasonable application"
> clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the
> state court identifies the correct governing legal principle from [the
> Supreme] Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for

Part II).

"[A] federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly.  Rather, that application must

also be unreasonable."  *Id.* at 411.  "AEDPA thus imposes a 'highly deferential standard

for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct.

2059, 2066 n.7 (1997), and 'demands that state-court decisions be given the benefit of

the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002) (*per

curiam*)."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).

8

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his claims "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

### III.  Discussion

**A.  The Line-up** (claim four)

The Court begins its discussion with Petitioner's fourth claim regarding the pretrial identification procedure. Petitioner contends that pretrial line-up was unduly suggestive because he was the only person in the line-up with light skin and long hair.

Petitioner raised this claim on direct appeal. The Michigan Court of Appeals stated that the line-up may have been somewhat suggestive because Petitioner was the only participant with braids and because Ms. Abro and Ms. Kinaia stated that they were told the robber was in the line-up. The Court of Appeals nevertheless concluded from the totality of the relevant circumstances that Petitioner's line-up passed constitutional muster.

#### 1.  Clearly Established Federal Law

The Supreme Court has stated that an identification procedure violates due process of law if the confrontation was "'unnecessarily suggestive and conducive to irreparable mistaken identification.'" *Neil v. Biggers,* 409 U.S. 188, 196 (1972) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)). "Suggestive confrontations are

9

disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Id.* at 198. Courts in this Circuit follow a two-part analysis when determining whether an identification is admissible. *Cornwell v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009).

> The court first considers whether the procedure was unduly suggestive. *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001); *Ledbetter v. Edwards*, 35 F.3d 1062, 1070-71 (6th Cir. 1994). The court must decide if the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection. *Wilson*, 250 F.3d at 397. "The defendant bears the burden of proving this element." *Ledbetter*, 35 F.3d at 1071 (citation omitted). If the procedure was suggestive, the court then determines whether, under the totality of the circumstances, the identification was nonetheless reliable and therefore admissible. *Wilson*, 250 F.3d at 397 (citation omitted); *Ledbetter*, 35 F.3d at 1071.

*Id.*

### 2. Application

The only two eyewitnesses to testify at the *Wade* hearing[1] on the constitutionality of the line-up were Ms. Abro and Ms. Kinaia, who were the cashiers during the Banner Supermarket robbery on April 22, 2008. They were told that the suspect was in the line-up. (*Wade* Hr'g, 8, 15, July 11, 2008.) This did not necessarily render the line-up unduly suggestive, particularly because the witnesses promptly and unequivocally identified Petitioner as the robber and they were not told which man the police thought was the suspect. *United States v. Porter*, 29 F. App'x 232, 237 (6th Cir. 2002). Nevertheless, because at least one of the witnesses described the suspect to the police as having braids (*Wade* Hr'g Tr., 10, July 11, 2008), and because Petitioner

---

[1] *See Wade v. United States*, 388 U.S. 218 (1967).

was the only participant in the line-up with long, braided hair (*id.* at 15-16), the line-up was suggestive.

The Court therefore proceeds to an evaluation of whether, under the totality of the circumstances, there was an independent basis for the witnesses' identification of Petitioner.  The following five factors must be considered when determining whether an identification was reliable despite its suggestiveness:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200.

### a.  Opportunity to View the Suspect

The first *Biggers* factor assesses the witness's opportunity to view the suspect at the initial observation.  Ms. Abro testified at the *Wade* hearing that the robbery may have lasted ten to fifteen minutes, that she saw the robber's face, and that he was right in front of her.  (*Wade* Hr'g Tr., 8-9, July 11, 2008.)   At trial, she testified that she saw the robber twice:  when he first approached her and after he returned from talking to the other cashier.  (Trial Tr. Vol. I, 93, Aug. 14, 2008.)

Ms. Kinaia testified at the *Wade* hearing that her contact with the robber was very brief, but that the robbery may have lasted a little more than five minutes.  (*Wade* Hr'g Tr.,17, July 11, 2008.)  Although she was in pain because the robber hit her on the shoulders, she claimed that she looked at the robber when she was handing him the money.  She noticed his nose and braided hair.  (*Id.*)  At trial, she said that she had a

"pretty good look" at the robber's face.  (Trial Tr. Vol. I, 104, Aug. 14, 2008.)  The Court

concludes that the witnesses had a good opportunity to view the shooter.

### b.  Degree of Attention

The second *Biggers* factor assesses the witness's attentiveness during the initial

observation.

> To analyze the sufficiency of an eyewitness's degree of attention, [courts]
> generally examine the circumstances surrounding the witness's
> encounter. *United States v. Thomas*, 116 Fed. Appx. 727, 736 (6th Cir.
> 2004), *vacated on other grounds*, 543 U.S. 1116, 125 S.Ct. 1104, 160
> L.Ed.2d 1064 (2005) (remanding in light of *United States v. Booker*, 543
> U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)).  [Courts] find more
> reliability where a witness was able to view the assailant with a
> "heightened degree of attention, as compared with disinterested
> bystanders or casual observers."  *United States v. Crozier*, 259 F.3d 503,
> 511 (6th Cir. 2001) (quotation omitted).   Generally, [courts] place greater
> trust in witness identifications made during the commission of a crime
> because the witness has a reason to pay attention to the perpetrator.  *See
> United States v. Meyer*, 359 F.3d 820, 826 (6th Cir. 2004) (finding
> heightened degree of attention where witness spoke with robber and
> studied his features while looking for an opportunity to escape); *Crozier*,
> 259 F.3d at 511 (finding heightened degree of attention where robber
> confronted witnesses with a gun).

*Howard v. Bouchard*, 405 F.3d 459, 473 (6th Cir. 2005).

Both Ms. Abro and Ms. Kinaia had a heightened degree of attention because the

robber approached them with a gun.  Ms. Abro, in fact, implied at the pretrial hearing

that she could not forget Petitioner's face because his gun was in her face during the

robbery.  (*Wade* Hr'g Tr., 12, July 11, 2008.)  The Court concludes that the witnesses

were attentive during the robbery.

### c.  Accuracy of Description

The third *Biggers* factor examines the accuracy of the witness's prior description

of the defendant.  The Court has found no reference in the record to Ms. Kinaia's

description of the robber to the police. Ms. Abro, however, claimed that she described the robber to the police as a black man with a somewhat big nose and braids, which showed under the towel that he wore on his head. (*Id.* at 9-10.) Petitioner does not dispute the accuracy of this description. The Court concludes that Ms. Abro's limited description of the suspect was accurate.

### d. Level of Certainty

The fourth *Biggers* factor examines the witness's level of certainty at the pretrial confrontation. Ms. Abro testified at the pretrial hearing that she recognized Petitioner "right away" in the line-up and that she did not bother to look at the other participants in the line-up for this reason. (*Id.* at 11-12.) Ms. Kinaia also testified that she immediately recognized Petitioner in the line-up. (*Id.* at 16.) Although she initially informed the police that she was not a hundred percent sure, she claimed at trial that she later realized it was him. (Trial Tr. Vol. I, 108, Aug. 14, 2008.) The Court concludes that both witnesses were certain of their identifications.

### e. Length of Time

The final *Biggers* factor looks at the length of time between the crime and the identification. The Banner Supermarket robbery occurred on April 22, 2008. The lineup was held eight days later on April 30, 2008. The length of time between the crime and the identifications was not significant.

### 3. Summary

The Court concludes from the totality of the circumstances that there was an independent basis for Ms. Abro's and Ms. Kinaia's identification of Petitioner. Both eyewitnesses had a good opportunity to view the suspect, and their attention was

13

heightened by the presence of a gun.  Ms. Abro's limited description of Petitioner was accurate, and both women were sure of their identifications.  The length of time between the crime and the identification was short.  Consequently, the witnesses' identification of Petitioner was reliable enough to overcome any suggestiveness in the lineup and to be admissible.[2]

---

[2]  It also appears that there was an independent basis for the identification of Petitioner as the robber in the Food Giant robbery.  Nidhal Yono testified at the preliminary examination that she looked "really good" at Petitioner's face during the robbery. (Prelim. Examination Tr., 15, June 3, 2008.)  She claimed that Petitioner had medium dark complexion and that all six of the participants in the line-up had a similar skin tone. (*Id.* at 15-17.)  At trial, Ms. Yono testified that she saw the robber's face during the robbery and that she was able to identify Petitioner "right away" in the line-up because she remembered his face.  (Trial Tr. Vol. I, 24-25, 27-28, 34, Aug. 14, 2008.)

Debra Leach testified at the preliminary examination that the store was well lit during the robbery and that nothing covered Petitioner's face.  (Prelim. Examination Tr., 25-26, June 3, 2008.)  She informed the police that Petitioner was twenty-five to thirty-five years old and that he had a medium complexion.  (*Id.* at 29.)  Petitioner was twenty-six years old at the time.  At trial, Ms. Leach testified that she saw the robber's face for only a few seconds, but she claimed that was long enough.  (Trial Tr. Vol. I, 46, Aug. 14, 2008.)

The store manager, Ghazwan Denha, was confident in his identification of Petitioner, claiming at trial that, "You can't forget a face."  (*Id.* at 59.)  He described the robber to the police as twenty-four or twenty-five years old, five foot, seven inches to five foot, nine inches and fair complected, not too dark and not too white.  Mr. Denha also stated that Petitioner had braids and a little goatee.  (*Id.* at 49-50.)  Petitioner does not dispute this description, and the record indicates that he was five foot, nine inches tall and twenty-six years old at the line-up.

To summarize, the eyewitnesses to the first robbery had an independent basis for identifying Petitioner.  They had a good opportunity to view the suspect during the robbery, their attention to the suspect was good, their prior descriptions of Petitioner were accurate, they were certain of their identifications, and the length of time between the crime and the line-up (eleven days) was short.

The state appellate court's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, *Biggers*.  Therefore, Petitioner is not entitled to habeas corpus relief on the basis of his challenge to the line-up.

**B.  The Trial Court's Ruling on the Constitutionality of the Line-up** (claim one)

Petitioner argues in a related claim that the trial court abused its discretion when ruling on the constitutionality of the line-up.  Petitioner contends that the trial court focused on the participants' height and weight even though the witnesses based their description on skin tone and hair.

On direct review, Petitioner argued that the trial court improperly focused on the presence of an attorney at the line-up and the attorney's lack of objection to the identification procedure.  The Michigan Court of Appeals rejected Petitioner's suggestion that the trial court applied an incorrect legal standard.

Petitioner is raising a slightly different claim here, contending that the trial court improperly focused on the height and weight of the line-up participants.  Because no state court adjudicated this claim on the merits, "the deference due under AEDPA does not apply," *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003), and this Court's review is *de novo*, *McAdoo v. Elo*, 365 F.3d 487, 498 (6th Cir. 2004).

**1.  Clearly Established Federal Law**

"Most eyewitness identifications involve some element of suggestion." *Perry v. New Hampshire*, 132 S. Ct. 716, 727 (2012),   But

> [a]n identification infected by improper police influence . . . is not
> automatically excluded.  Instead, the trial judge must screen the evidence
> for reliability pretrial.  If there is "a very substantial likelihood of irreparable
> misidentification," *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct.
> 967, 19 L.Ed.2d 1247 (1968), the judge must disallow presentation of the

15

evidence at trial.  But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.

*Id.* at 720.

### 2. Application

Petitioner has submitted a copy of the "Showup & Photo Identification Record" to the Court as "Documentation."  *See* ECF No. 8, page 5; ECF No. 9, page 18.  This record indicates that the six men in the line-up ranged in height from five feet, eight inches to five feet, ten inches and that their weight ranged from 155 pounds to 200 pounds.  Defense counsel conceded at the *Wade* hearing that there were some similarities among the participants as far as race, weight, and height were concerned, but that Petitioner was the only person with braided hair.  (*Wade* Hr'g Tr., 20, July 11, 2008.)

The trial court agreed that Petitioner was the only participant in the line-up with braids, but nevertheless stated that Petitioner had failed to show that the line-up was unduly suggestive.  The court noted that an attorney was present at the line-up to ensure its fairness.  The trial court went on to say that all the men in the lineup  were "within the ballpark" in terms of age, height, and weight.  The trial court concluded that the line-up was constitutional, but subject to cross-examination at trial as to weight and as to Ms. Kinaia's comment that she was not 100 percent sure of her identification.  (*Id.* at 21-22.)

Although the trial court did not mention the participants' complexion, the court did screen the identification evidence for reliability and implicitly concluded that the indicia

16

of reliability outweighed any suggestive circumstances.  This Court, moreover, determined above that, even if the line-up was suggestive, the eyewitnesses had an independent basis for their identification of Petitioner.  Therefore, even if the state trial court abused its discretion when assessing the suggestiveness of the line-up, the eyewitnesses' identification testimony did not deprive Petitioner of a fair trial.  Habeas relief is not warranted on Petitioner's claim.

## C.  Trial Counsel (claims two and three)

In his remaining two claims, Petitioner alleges that his trial attorney provided ineffective assistance.  Specifically, Petitioner claims that his attorney failed to view the evidence about which he was most interested, did not care about his concerns, and "did the bare minimum."  Pet. at 6.  Petitioner further alleges that trial counsel failed to perform a pretrial investigation on the line-up.  Petitioner claims that he informed his attorney that the line-up was suggestive due to differences in skin tone and hair and because of what the police told the witnesses before the line-up.

No state court adjudicated these claims on the merits.  Therefore, this Court's review is *de novo*.  *McAdoo v. Elo*, 365 F.3d at 498.

### 1.  Clearly Established Federal Law

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), is clearly established federal law for purposes of Petitioner's ineffective-assistance-of-counsel claim.  *Cullen v. Pinholster*, 563 U.S. 170, __, 131 S. Ct. 1388, 1403 (2011).  Under *Strickland,* a defendant must show that his trial attorney's "performance was deficient" and "that the deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687.  "Unless a defendant makes both showings, it cannot be said that the

17

conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

The "deficient performance" prong of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

To demonstrate that counsel's performance prejudiced the defense, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S. at 693).

### 2. Application

The record does not support Petitioner's contention that his attorney did "the bare minimum" or that the attorney failed to adequately investigate the line-up. The attorney moved to suppress the identification testimony, thoroughly questioned the eyewitnesses at the *Wade* hearing, elicited testimony regarding what the police told them before the line-up, and argued that the line-up was suggestive because Petitioner was the only person with braids.

At trial, defense counsel cross-examined prosecution witnesses, presented an alibi witness for the first robbery, and produced Petitioner to explain his activities on the day of the second robbery. In his closing argument, defense counsel pointed out that

18

Petitioner's fingerprints were not found on the gun in evidence.  He also maintained that the witnesses' identifications were not credible because the witnesses were nervous and had only a brief opportunity to view the robber.

The record also does not support the contention that trial counsel failed to address Petitioner's concerns.  The attorney consulted Petitioner as to whether he wanted to consolidate his two cases and waive his right to a jury trial.  (*Wade* Hr'g Tr., 23-25, July 11, 2008.)  The attorney also requested supplemental discovery (*id.* at 25), and Petitioner himself addressed the trial court on the issue of the suggestiveness of the line-up and the lack of photographs of the participants in the line-up.  (*Id.* at 29-30.)

The Court concludes that defense counsel's performance was not deficient. Furthermore, the evidence against Petitioner was overwhelming.  Three eyewitnesses from each robbery independently identified Petitioner as the robber, and Petitioner was caught following a chase after the second robbery.  Therefore, the allegedly deficient performance could not have prejudiced the defense.  Habeas relief is not warranted on Petitioner's claims of ineffective assistance of counsel.

## IV.  Conclusion

The state appellate court's adjudication of Petitioner's first claim on the merits was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts.  As for Petitioner's remaining claims, which were not adjudicated on the merits in state court, the Court concludes from a *de novo* review of the claims that Petitioner's constitutional rights were not violated.  The Court  denies Petitioner's habeas corpus petition (ECF No. 1) and his request for appointment of counsel (ECF No. 13).

19

## V.  Denying a Certificate of Appealability, but
## Granting Leave to Proceed *In Forma Pauperis* on Appeal

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition.  Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]"  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."   *Miller El,*  537 U.S. at 327.

For the reasons given above, reasonable jurists would not find the Court's assessment of Petitioner's claims debatable or wrong.  Nor would reasonable jurists conclude that the issues deserve encouragement to proceed further.  The Court declines to issue a certificate of appealability on any of Petitioner's claims.  Nevertheless, Petitioner may appeal this Court's decision *in forma pauperis*, because he was permitted to proceed *in forma pauperis* in this Court, and an appeal could be taken in good faith.  Fed. R. App. P. 24(a)(3)(A).

Dated: 12/22/2015

S/Victoria A. Roberts
VICTORIA A. ROBERTS
UNITED STATES DISTRICT JUDGE

20